UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
    NILTON RODRIGUEZ,                                       :
                                                           :
                                        Petitioner,        :
                                                           :          15-CV-5075 (JPO)
                        -v-                                 :
                                                           :          OPINION AND ORDER
    DONALD UHLER, Superintendent, Upstate                  :
    Correctional Facility,                                  :
                                        Respondent.        :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

    *Pro se* petitioner Nilton Rodriguez has filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C § 2254, seeking review of his conviction in the Supreme Court of New

York, New York County, on one count of course of sexual conduct against a child in the first

degree, New York Penal Law § 130.75(a).  (Dkt. No. 1 ("Petition").)  For the reasons that follow,

the Petition is denied.

I.      **Background**

    A.      **The Crimes, Indictments, and Trial**

    From 1999 to 2003, Rodriguez was in a relationship with Leni, the mother of L.S.,[1] the

complainant in Rodriguez's underlying criminal case.  They lived together in a two-bedroom

apartment in Manhattan with L.S., and for part of that time with L.S.'s grandmother, Luz (Leni's

mother).  (Dkt. No. 13, Trial Transcript ("T") at 35, 36, 38-39, 109-10, 113, 177-79.)[2]  The

_____

    [1]    The Court refers to the victim by her initials to preserve her confidentiality.
Because the victim's mother and grandmother have the same surname as the victim, the Court
refers to them by their first names.

    [2]    The Trial Transcript, State Record, and Sentencing Transcript, are all filed under
seal at Docket Number 13.  (*See* Dkt. No. 13, Trial Transcript ("T"); *id.* State Record ("SR"); *id.*
Sentencing Transcript ("ST")).

relationship was volatile and there were frequent arguments.  (*Id.* at 117-18, 181, 277.)  During

the course of the relationship, L.S. was between roughly six and twelve years old.  (*Id.* at 36, 38,

179.)

At trial, L.S. testified to repeated inappropriate contact with Rodriguez.  On New Year's

Eve when L.S. was six or seven years old, Rodriguez kissed her on the lips while she was in bed.

(*Id.* at 41-44.)  This kissing on the lips continued throughout their time living together, "a lot of

the days of the week, not every day, but when there wasn't anybody around."  (*Id.* at 59, 67.)

Early on, Rodriguez told L.S. not to tell anyone about what had happened.  (*Id.* at 69-70, 75.)  At

some point after the initial New Year's kiss, Rodriguez on two occasions asked L.S. for a hug

just after he had showered; each time she complied, and he opened his bathrobe to reveal he was

naked and his penis touched her body.  (*Id.* at 44-46.)

When L.S. was seven years old, Rodriguez on at least three occasions touched her vagina

over her underwear.  (*Id.* at 48-51.)  On one of these occasions, Rodriguez put his finger in her

vagina and told her it was wet.  (*Id.* at 50-51.)  When L.S. was around eight years old, Rodriguez

asked her to perform oral sex on him, to suck on his penis "like it was a lollipop."  (*Id.* at 52-55.)

He ejaculated into her mouth and told her to swallow it "because it was good for [her]," just like

the "stuff a banana has."  (*Id.* at 53.)  On another occasion, he asked her to perform oral sex on

him again, and she again complied.  (*Id.* at 54-55.)

When L.S. was around nine years old, she attended a Yankees game with Rodriguez.  On

the way home that night, they lingered in a deserted park and he again asked her to perform oral

sex, but she declined.  (*Id.* at 55-56.)  Rodriguez on two occasions pulled down her underwear,

sat her on the toilet, and pushed his penis against her vagina, without penetration.  On both

occasions, he ejaculated into his hand.  (*Id.* at 58-64.)  In an additional instance of penis-vagina

contact, when L.S. was nine years old, while in L.S.'s bedroom, Rodriguez pushed his penis

against her vagina and "the tip of his penis went in a little bit and it hurt a lot."  She told him to stop, but he continued "lightly" pushing against her vagina until he ejaculated into his hand.  (*Id.* at 61-64.)

Then in May 2003, when L.S. was ten years old, Leni walked in on Rodriguez kissing L.S. on the lips and unbuttoning her pants while they were on the sofa in their apartment.  Leni promptly hit him with a cooking implement.  (*Id.* at 64-66.)  Rodriguez moved out within days. (*Id.*)

A few months later, Leni and L.S. visited Rodriguez at his new apartment to see Rodriguez's dog, which had lived with them before Rodriguez moved away.  (*Id.* at 66-67.) Aside from two other non-sexual encounters when Rodriguez visited Luz's apartment a year or so later and when he made a phone call to the apartment, L.S. had no further contact whatsoever with Rodriguez until the state criminal case.  (*Id.* at 68-69; 73.)

On June 21, 2010, Rodriguez was indicted on two counts of Course of Sexual Conduct Against a Child in the First Degree.  He filed a motion to dismiss the indictment as improperly charged, which was granted.  (State Record ("SR") at 167.)  The case was re-presented to the grand jury, and a new indictment was issued on January 19, 2011, charging Rodriguez with one count of Course of Sexual Conduct against a Child in the First Degree, for abuse of L.S.  (*Id.*)  In April 2011, Rodriguez fired his attorney, Charles Abercrombie, and hired Michael Discioarro as his attorney for trial.  (*Id.* at 168.)  Rodriguez explicitly waived his right to a trial by jury, and proceeded with a bench trial on September 20, 2011.  (*Id.*)

Prior to opening statements, defense counsel sought to preclude mention of Rodriguez's prior convictions.  (T. at 10-17.)  Among the prior convictions described to the judge by the prosecution was one from 1998 for sexual misconduct under N.Y. Penal Law § 130.20, for which Rodriguez served forty-five days in jail after pleading guilty.  (T. at 12.)  In that case,

according to the prosecutor, Rodriguez had approached his roommate's girlfriend while she slept and performed oral sex on her.  (*Id.*)  The judge permitted the prosecutor to ask Rodriguez whether he'd been convicted of a Class A Misdemeanor, but precluded questions regarding the underlying facts or the title of the penal law violated.  (T. at 15-16.)

At trial, L.S. testified to not reporting the abuse until 2009, because she feared Rodriguez might become violent against her, Leni, or Luz.  (*Id.* at 69.)  However, L.S. also testified that she "loved [Rodriguez]," because he "hung out" with her and she "didn't think what was going on was bad."  (*Id.* at 70.)  It was not until a couple of years after the incidents occurred that she recognized that what Rodriguez had done to her was wrong.  (*Id.* at 70-71.)  During high school, she fell into a depression, started performing poorly in classes, had difficulty sleeping, and was consuming sleeping pills and alcohol.  (*Id.* at 71-74.)  Only when confronted by her mother about her drinking, years after the abuse had ended and her last contact with Rodriguez, did L.S. reveal the history of abuse.  (*Id.* at 71-72.)

On cross-examination of L.S., defense counsel pointed out that L.S. had earlier in her trial testimony said there were three instances of oral sex, whereas in later trial testimony she said there were only two instances of oral sex, and that she did not perform oral sex upon the third request, in the park following the Yankees game.  (*Id.* at 89.)  L.S. admitted that she was "wrong" when she said oral sex had happened three times.  (*Id.*)  Further, defense counsel elicited that L.S. did not remember anything about the Yankees game she attended, but was able to remember all the details of the park where Rodriguez requested oral sex.  (*Id.* at 90.)  On cross-examination, L.S. also admitted that Leni or Luz was home most of the time at the beginning of the period of abuse. (*Id.* at 91.)

Defense counsel also elicited L.S.'s admission that she noted on hospital medical forms in 2005 that she had never engaged in oral or vaginal sex or been abused.  (*Id.* at 92-93.)  L.S. on

cross examination also admitted that she was not afraid of Rodriguez once he moved out, and that she requested the visit to Rodriguez's apartment to see the dog, despite the abuse, and was willing to stay there overnight.  (*Id.* at 93-94.)

Defense counsel also drew out discrepancies between L.S.'s grand jury and trial testimony regarding the last kissing incident.  (*Id.* at 95-96.)  He posed questions suggesting that Leni had drug and alcohol problems, and that Rodriguez financially provided for them.  (*Id.* at 96-101.)  To conclude his cross-examination, defense counsel elicited from L.S. that Rodriguez had "never" had sexual intercourse with her.  (*Id.* at 101.)

On her direct examination, Leni testified regarding the kissing incident she had witnessed, and said that L.S. had told her that it was the only time Rodriguez had kissed or touched her in that way.  (*Id.* at 120.)  Leni testified to still loving Rodriguez after he moved out, but wanting him to get help; she saw him regularly for several months afterwards.  (*Id.* at 122-23.)  She noted a couple of times she had bumped into him in the years since.  (*Id.* at 124-25.)

On cross-examination of Leni, after inquiring as to drug, alcohol, and financial difficulties, defense counsel elicited that Rodriguez had herpes, a contagious disease, and advanced the notion that Leni had contracted it from Rodriguez, though she denied it.  (*Id.* at 128-29.)  On cross-examination, Leni admitted that she may have consumed alcohol the day of the kissing incident she witnessed, and that she did not call the police after witnessing the incident.  (*Id.* at 130-32.)  She also admitted that the kissing incident made Rodriguez "not someone you want to have around your child," and that she wanted to "kill" him, yet she and L.S. visited Rodriguez after the kissing incident anyway and stayed overnight.  (*Id.* at 131-33.)  Defense counsel also elicited that despite this kissing incident, Leni loved Rodriguez, and reached out to him for help even after he moved out.  (*Id.* 134-36.)  On re-cross, Leni also admitted that they relied on Rodriguez, but that he didn't have "long periods of extended alone

time" with L.S.  (*Id.* at 142.)  Leni also noted on cross that she had met Rodriguez and his new

fiancée at a bar years after he moved out. (*Id.* at 138.)

The People then introduced testimony from an expert in child sexual abuse and

developmental psychology, Dr. Eileen Treacy.  (*Id.* at 152.)  Treacy testified to general patterns

of behavior among victims of childhood sexual abuse.  (*Id.* at 153.)  She also noted the variety of

reactions minors have to abusers, that loving an abuser is more common than hating, and that the

closer the relationship, the less likely the victim is to report the abuse; she confirmed that some

victims even keep the secret into old age.  (*Id.* at 158-62.)

On cross-examination, defense counsel elicited that Dr. Treacy had served as a defense

witness only ten percent of the time (suggesting a prosecution bias in analysis) (*id.* at 166); had

previously found a child not to be a reliable reporter of abuse (*id.* at 167); and that child

witnesses have made false reports of abuse to cover up misdeeds (*id.* at 173.).  Defense counsel

also drew out that Dr. Treacy had not, aside from a brief discussion with the assistant district

attorney, reviewed any evidence in the Rodriguez case, or spoken to any of the witnesses, a

much lower degree of involvement than in other cases she had worked on.  (*Id.* at 169-170.)

Luz, on direct examination, corroborated the volatile nature of Leni and Rodriguez's

relationship, and that Leni and L.S. were distraught when he moved out.  (*Id.* at 193-94.)  On

cross-examination, Luz admitted that she moved back in with Leni after Rodriguez moved out

because Leni could not afford the rent on her own.  (*Id.* at 202.)

Defense counsel also called Detective Hernandez, who had interviewed L.S. as part of the

abuse investigation.  (*Id.* at 210.)  Counsel elicited from Detective Hernandez that the DD-5

police form memorializing the interview showed that L.S. had told him that she had engaged in

oral sex "just about every day" with Rodriguez, contravening L.S.'s testimony at trial that there

were only a few instances of oral sex; Detective Hernandez excused it as a mis-transcription,
referring to something other than oral sex.  (*Id.* at 210-16.)

Rodriguez's aunt testified that Leni did not want Rodriguez to move out, even after the
kissing incident.  (*Id.* at 222-23.)

Finally, Rodriguez himself testified.  Defense counsel elicited that Rodriguez had
contagious herpes and this had strained the relationship with Leni.  (*Id.* at 228.)  Leni was behind
in rent and using alcohol and cocaine when he moved in.  (*Id.* at 229.)  Rodriguez ended up
covering living expenses for Leni and L.S.  (*Id.*)  Rodriguez testified that he eventually decided
to move out in May 2003, and obtained a lease for a new apartment, and informed Leni, who
promptly "flip[ped] out," cried, and talked about how Rodriguez was their support.  (*Id.* at 230-
32.)

Rodriguez also provided a markedly different description of the "kissing incident" that
Leni witnessed.  He testified that, two days after he informed Leni about moving out, after a day
at the beach where Leni drank six piña coladas (*id.* at 232), L.S. and Rodriguez were sitting on
the sofa watching television and L.S. was kissing him on the cheek saying, "I love you daddy, I
love you daddy."  (*Id.* at 233.)  Then Leni, in a drunken stupor, entered the room and accused
him of kissing L.S.  Rodriguez responded: "Are you crazy, are you still drunk?"  (*Id.*)  Leni then
hit him with a spatula, and said that if L.S. had herpes, she was going to call the police.  (*Id.* at
233.)  He then moved out.  (*Id.* at 284.)  Despite this altercation, Leni and L.S. visited him four
months later (*id.* at 235-39), and Leni on another occasion sought Rodriguez's help in dealing
with a woman threatening to assault her, a situation Rodriguez defused (*id.* at 239-40).  She also
asked him for money, according to his testimony.  (*Id.* at 244.)  Rodriguez was "always very
friendly" with Leni, but when Leni met Rodriguez's fiancée at a party, Leni gave them dirty
looks, which made Rodriguez uncomfortable.  (*Id.* at 241.)

Rodriguez further testified that he was never home alone with L.S., and strenuously denied all of the alleged inappropriate acts with L.S.  (*Id.* at 242-44.)

On cross-examination, Rodriguez described the progression of his volatile relationship with Leni, and noted uneventful social interactions he had with Leni and L.S. after he moved out. (*Id.* at 258-263, 276-78.)  He recounted the tension when Leni met his fiancée at a bar in 2009. (*Id.* at 264-67.)  The prosecutor elicited some discrepancies between how Rodriguez described the Leni-fiancée meeting at trial and in a prior interview with the prosecutor, when it was described as amicable.  (*Id.* at 264-67.)  The prosecutor pointed out that in a previous statement to the prosecutor, Rodriguez had said that he moved out because he was acting like an animal and scaring L.S. (*Id.* at 283.)  Rodriguez said he would not respond to further questions about that prior statement, because it was taken when he was in shock, but he eventually responded to questions posed.  (*Id.* at 283-84.)

Although it is not reflected in the trial transcript, the trial judge permitted the prosecutor, over defense counsel's objection, to inquire about Rodriguez's prior sexual misconduct conviction after Rodriguez had opened the door on direct by stating that he could not secure employment because this charge appeared on a background check.  (Petition at 51-52; SR at 185-86; T. at 244.)  The prosecutor proceeded, on cross, to question him in general terms about the sexual misconduct conviction; Rodriguez promptly volunteered unsolicited facts regarding the conviction ("they say that I performed—I forced myself and orally tried to do something" to the victim), and denied having committed the crime, despite having pleaded guilty.  (T. at 286-91.) Defense counsel objected to the continued line of questioning.  (*Id.* at 290.)

In his opening and closing statements (*Id.* at 23-27; 294-301), defense counsel depicted Leni as a drug and alcohol user who was cash-strapped and depended on Rodriguez to cover her living costs.  He pointed out the weaknesses in the prosecution's case: the good relations after

8

the kissing incident (*id.* at 23-25, 297-98, 301); the incorrect dates in the indictment (*id.* at 294-95); L.S.'s apparently contradictory statements that there had not been sexual intercourse yet Rodriguez had inserted his penis into her vagina (*id.* at 295); the tight quarters of the apartment and the constant presence of other family members, reducing the opportunities for abuse (*id.* at 297); Detective Hernandez's DD5 report showing an accusation of oral sex every day, unlike the two or three incidents alleged at trial (*id.* 295-96); the delay in the reporting of abuse (*id.* at 300-301); the medical form on which L.S. indicated that she had never engaged in sex or been abused (*id.* at 25); Dr. Treacy's admission that children in trouble can make up these kinds of relationships (*id.* at 299); and the irrelevance of the conviction from thirteen years prior (*id.* at 299-301).

On September 29, 2011, the court found Rodriguez guilty of Course of Sexual Conduct against a Child in the First Degree.  (*Id.* at 323.)  On October 17, 2011, the court sentenced Rodriguez to a determinate prison term of twenty years with twenty years of post-release supervision.  (ST at 22.)

### B.    Section 440 Motion to Vacate the Verdict

Rodriguez moved in the trial court to vacate the judgment of conviction pursuant to New York Criminal Procedural Law § 440.10,[3] claiming that defense counsel had been ineffective because he had failed to present readily available evidence, that would have "convinced this court to acquit him."  (SR at 5.)  In particular, Rodriguez contended that defense counsel was ineffective in failing (1) to call defense expert Dr. N.G. Berrill to rebut the state's psychologist expert; (2) to introduce pay stubs and leases that indicated that Rodriguez planned to move out of

---

[3]    As relevant here, Criminal Procedure Law § 440.10 provides for vacating a judgment if it was procured in violation of a state or federal constitutional right or if there was improper conduct not appearing in the record which, if it had appeared on the record, would require reversal of the judgment on appeal.

Leni's residence prior to the alleged kissing incident with L.S.; (3) to demonstrate that L.S. would have contracted herpes from Rodriguez if there had been sexual contact; (4) to introduce photographs of Rodriguez and Leni from a Halloween party after he moved out, suggesting continued good relations; (5) to introduce evidence of Leni inviting Rodriguez to another party after he moved out; (6) to sufficiently undermine detective Hernandez's testimony; (7) to further undermine L.S.'s testimony on cross-examination by pointing out inconsistencies in her story; (8) to introduce evidence contradicting L.S.'s statement that she did not know a friend of Rodriguez who had paid for a family outing; (9) to undermine Leni's testimony that she threw Rodriguez out of their apartment; (10) to prepare Rodriguez for his testimony; and (11) to object to the prosecutor's violation of the trial court's *Sandoval* ruling limiting questions regarding the facts underlying the 1998 sexual misconduct conviction.  (SR at 33-54.)  Further, Rodriguez argued for vacating the verdict based on his "actual innocence."  (*Id.* at 55.)

On April 3, 2013, the New York Supreme Court denied the motion, finding that Rodriguez's ineffective assistance of counsel allegations lacked merit, and did not meet the *Strickland* standard for ineffective assistance of counsel.  (Dkt. No. 1 at 40-52.)  The judge found that Rodriguez failed to show the admissibility of the defense expert's testimony; material put forward in the Section 440 motion had insignificant evidentiary value; and certain impeaching evidence would have been inadmissible.  (*Id.*)  In finding counsel not ineffective, the court also pointed to defense counsel's repeated attempts to undermine L.S.'s and Detective Hernandez's testimony.  (*Id.* at 50-51.)  As for the claim that defense counsel had not adequately prepared Rodriguez for his testimony, the court found that the specific complaints were unrelated to trial preparation.  (*Id.* at 51.)  Further, the court held that defense counsel's failure to object to the introduction of a prior conviction was non-prejudicial, since it was a bench trial, and a judge is uniquely capable of making an objective determination based upon appropriate legal criteria, and

10

the trial judge had been made aware of the prior conviction through the *Sandoval* application itself.  (*Id.* at 52.)  The Appellate Division did not permit appeal of the order denying the Section 440 motion.  (SR at 763.)

### C.     The Direct Appeal

On direct appeal to the Appellate Division, Rodriguez's counsel argued that: (1) the verdict was against the weight of evidence, given the sharp conflicts within testimony from the complainant and her mother; (2) significant portions of the People's expert testimony were improperly admitted, depriving Rodriguez of his Due Process right to a fair trial; and (3) the sentence should be reduced.  (*Id.* at 764-833.)

The Appellate Division, First Department, affirmed the conviction, finding no basis for disturbing the court's credibility determinations, and noting that the victim's mother provided significant corroborating testimony.  *People v. Rodriguez*, 115 A.D.3d 580, 581 (N.Y. App. Div. 1st Dep't 2014).  The court also found that Rodriguez's claim regarding the People's expert testimony and the related Due Process claim were procedurally barred, as his objection to the expert testimony at trial was on completely different grounds than those raised on appeal; in the alternative, the court held that the court properly exercised its discretion in admitting the expert testimony.  *Id.*  The New York Court of Appeals denied leave to appeal.  *People v. Rodriguez*, 23 N.Y.3d 967 (N.Y. 2014).

### D.     The Habeas Petition

On June 29, 2015, Rodriguez submitted his petition for a writ of habeas corpus to this Court.  His petition seeks relief on the grounds of (1) ineffective assistance of defense counsel, and (2) actual innocence.

## II.     Legal Standard

### A.     Exhaustion

A federal court may not consider a habeas corpus petition unless the petitioner has exhausted all state judicial remedies.  *See* 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  A state remedy has been exhausted when a petitioner has presented the federal constitutional claim asserted in the petition to the highest state court and thus adequately informed the court of both the legal and factual bases for the federal claim.  *Picard*, 404 U.S. at 275–77; *see also Lurie v. Wittner*, 228 F.3d 113, 123-24 (2d Cir. 2000).

"[W]hen a Petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review."  *Cone v. Bell*, 556 U.S. 449, 465 (2009).  However, "[a] 'state law ground is only adequate to support the judgment and foreclose review of a federal claim if it is firmly established and regularly followed in the state,' and application of the rule would not be 'exorbitant.'"  *Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Garvey v. Duncan*, 485 F.3d 709, 713-14 (2d Cir. 2007)).  A state court's finding of state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'"  *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted).  A finding of ineffective assistance of counsel may constitute "cause" excusing procedural default.  *Tavarez v. Larkin*, 814 F.3d 644, 650 (2d Cir. 2016).

### B.     Habeas Corpus

For a federal district court to grant a writ of habeas corpus, the petition must satisfy a "difficult to meet . . . and highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations and quotations omitted).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal district court may grant "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court . . . with respect to any claim that was adjudicated on the merits in State court" if (1) the adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under most circumstances, "a federal habeas court may not reach the merits if the state court's rejection of a federal claim 'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  "This rule applies whether the state law ground is substantive or procedural."  *Coleman*, 501 U.S. at 729.

Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."  *Parsad v. Greinera*, 337 F.3d 175, 181 (2d Cir. 2003).

III.   **Discussion**

The Court first addresses exhaustion and then addresses the merits of Rodriguez's claims.

### A.     Exhaustion

As described above, the majority of Rodriguez's claims on habeas were raised and denied in state court in his Section 440 motion, with leave to appeal denied by the Appellate Division. Accordingly, they are exhausted and properly before this court. *See Picard*, 404 U.S. at 275–77.

However, others of Rodriguez's arguments were never raised in state court and thus are procedurally barred, namely his contention that defense counsel erred in not submitting paystubs (to demonstrate his busy work schedule), and not raising some inconsistencies between L.S.'s and Leni's testimony at trial and before the grand jury.  As the reviewing state court never had an opportunity to pass on these issues, which are a factual basis for Rodriguez's claims, they cannot be the basis for habeas relief unless Rodriguez can show either (1) cause for his default and actual prejudice, or (2) that the Court's failure to consider his claim will result in a fundamental miscarriage of justice. *See Gray*, 518 U.S. at 162.  Cause is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state procedural rule. *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  The Supreme Court has suggested three ways, *inter alia*, that a petitioner may show cause for a procedural default: (1) the factual or legal basis for a claim was not reasonably available; (2) interference by state officials made compliance with the procedural rule impracticable; or (3) petitioner suffered ineffective assistance of counsel.  *See Carrier*, 477 U.S. at 488.  To demonstrate a fundamental miscarriage of justice, one must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Rodriguez fails to allege cause for his procedural default; he has claimed no ineffective assistance of counsel as to his state *appellate* representation when these issues first should have been raised.  Because a petitioner must establish both cause and prejudice, the failure to show

cause vitiates the claim.  *See, e.g.*, *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994).

Moreover, Rodriguez has not demonstrated a fundamental miscarriage of justice.  The record

here does not suggest actual innocence, given the credible testimony from the victim describing

multiple instances of sexual abuse, the corroboration from the mother witnessing the final act of

sexual conduct toward the victim, and Rodriguez's evasiveness on the stand.

  As the reviewing state court never had an opportunity to pass on these issues, and

Rodriguez has not shown cause for his default or a fundamental miscarriage of justice, these two

issues—defense counsel's not submitting paystubs or raising some inconsistencies between

L.S.'s and Leni's testimony at trial and before the grand jury—are not exhausted and are thus

procedurally barred on habeas review.

### B. Ineffective Assistance of Counsel

  Rodriguez contends that his defense counsel was constitutionally ineffective.  Rodriguez

primarily argues that his defense counsel failed to have an adequate strategy, as evidenced by

various choices counsel made during trial.  In addition, Rodriguez claims ineffective assistance

on the basis that defense counsel opened the door to the prosecution's questions regarding

Rodriguez's prior misdemeanor sexual misconduct conviction.  Finally, Rodriguez claims that

counsel failed to sufficiently prepare Rodriguez for his testimony.  (Petition at 12, 19-34.)

  Under *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on a claim of

ineffective assistance of counsel, a petitioner "must (1) demonstrate that his counsel's

performance fell below an objective standard of reasonableness in light of prevailing

professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly

deficient representation."  *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (quoting

*Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008)).  As to *Strickland*'s first prong, courts

"strongly presume[ ] [that counsel] rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690). As to the prejudice prong, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In this Circuit, the claim of ineffective assistance can turn on the cumulative effect of all instances of ineffective assistance together. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

On federal habeas review of a state ineffective assistance claim, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether the determination was *unreasonable*—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (emphasis added) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). This analysis requires "doubly deferential judicial review." *Id.*

### 1. Defense Counsel Strategy

Rodriguez first claims that defense counsel was ineffective by failing to have a trial strategy or "do basic homework or diligence." (Petition at 12.) He particularly criticizes counsel's failure to establish L.S.'s ulterior motives; to sufficiently challenge and rebut the prosecution's expert witness; to sufficiently undermine Detective Richard Hernandez's testimony; to sufficiently undermine L.S.'s and Leni's testimony by pointing out inconsistencies and introducing L.S.'s Facebook photos and evidence of Leni's inviting Rodriguez to social events after he moved out; to demonstrate that L.S. would have contracted herpes from Rodriguez if there had been sexual contact; and to introduce pay stubs and leases indicating that

Rodriguez planned to move out of Leni's residence prior to the alleged kissing incident with L.S. (*Id.* at 12, 19-34.)

"Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689); *accord United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (reasonably made strategic calls do not support ineffective assistance claim); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) ("decisions that fall squarely within the ambit of trial strategy, . . . if reasonably made, cannot support an ineffective assistance claim"); *see United States v. Simmons*, 923 F.2d 934, 956 (2d Cir. 1991) (defendant's displeasure with counsel's strategy does not establish ineffectiveness); *United States v. DiTommaso*, 817 F.2d, 201, 215 (2d Cir. 1987) (finding that a lack of success of counsel's chosen strategy does not warrant judicial second-guessing).  In particular, courts accord significant deference to a defense counsel's strategic decision of how to conduct cross-examination.  *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)).  Simply put: a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices."  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

Contrary to Rodriguez's habeas petition, his defense counsel did in fact employ reasonable trial strategies, and demonstrated ample familiarity with the particulars of the case, showing that he had sufficient preparation.  Defense counsel did much to discredit L.S.[4] and

---

[4]     On cross-examination of L.S., counsel elicited that she asked her mother to take her to Rodriguez's apartment after he moved out (T. at 93-94); Rodriguez treated her well (*id.* at

Leni[5] on cross-examination and to challenge their narrative of events.[6]  And though Rodriguez

contends that defense counsel failed to sufficiently challenge and rebut the prosecution's expert

witness, Dr. Eileen Treacy, defense counsel in fact vigorously cross-examined Dr. Treacy.[7]  So

too for counsel's examination of Detective Hernandez,[8] and his decision not to admit L.S.'s

---

98-99); she wasn't afraid of Rodriguez between the time he moved out and 2010 (*id.* at 93-94); she had performed oral sex on Rodriguez only two times, despite earlier testifying to three incidents (*id.* at 89); she had not disclosed prior oral sex or abuse on a 2005 medical questionnaire (*id.* at 92-94); and she could not recall any details of a Yankees game that they attended just before Rodriguez requested oral sex.  (*Id.* at 90-91.)

[5]       Counsel elicited from Leni on cross-examination that Rodriguez had herpes during their relationship (implying that had he engaged in sexual activity with L.S., she would have contracted it) (T. at 128-29); Leni may have been drinking on the day of the kissing incident (*id.* at 130-31); she wanted to kill him after the kissing incident, but did not call police (*id.* at 132); she still loved Rodriguez and saw him after she saw him kissing her daughter and attempted to repair the relationship (*id.* at 131-136); she relied on Rodriguez (*id.* at 137); she still trusted Rodriguez after the kissing incident (*id.* at 136); and that defendant did not have much time alone with L.S. (*id.* at 142).  Defense counsel also suggested through his questions that Leni had contracted herpes, abused drugs, and had affairs.  (*id.* at 127-29.)  Rodriguez contends that defense counsel erred in not introducing additional evidence of social invitations Leni sent to him after he moved out (Petition at 31); yet in fact, defense counsel elicited testimony from Leni that she loved Rodriguez and saw him regularly after he moved out (T. at 122-23).

[6]       In particular, counsel emphasized the suspiciousness of the time lag between the alleged abuse and the reporting, framing L.S.'s 2009 disclosure as a fiction to excuse her own misbehavior and alcohol use.  Defense counsel also framed Leni as an unstable, alcohol- and drug-addicted, money-strapped mother; counsel presented a story that Rodriguez financially supported Leni and L.S., and his departure (and its financial consequences) and later romantic relationship made L.S. and Leni resentful and helped spur on the accusations.  And emphasizing the apparently friendly contacts between Rodriguez and L.S. and Leni after the kissing incident and his moving out, and the inconsistencies in their testimony, again served to raise doubts about the veracity of the accusations.

[7]       In particular, counsel elicited testimony that Dr. Treacy had served as a defense witness only ten percent of the time (suggesting a prosecution bias in analysis) (T. at 166); had previously found a child not to be a reliable reporter of abuse (*id.* at 166-67); and that child witnesses have made false reports of abuse to cover up misdeeds (*id.* at 173).  Defense counsel also pointedly drew out that Dr. Treacy had not, aside from a brief discussion with the assistant district attorney, reviewed any evidence in the Rodriguez case, or spoken to any of the witnesses, in contrast to other cases she had worked on.  (*Id.* at 169-170.)

[8]       Defense counsel demonstrated preparation and proper lawyering in eliciting from Detective Hernandez that the DD-5 police form showed that L.S. had told him that she had

Facebook photos[9] or evidence of Rodriguez's paystubs or lease,[10] and not to pursue a line of inquiry regarding Rodriguez's herpes.[11]  While these strategies may not have carried the day,

---

engaged in oral sex "just about every day" with Rodriguez, contravening L.S.'s testimony at trial that there were only a few instances of oral sex, and thereby impeaching L.S.  (T. at 210-14.) While the prosecution and Detective Hernandez apparently succeeded in convincing the judge that this "just about every day" phrase was merely a mistranscription and that L.S.'s statements to Hernandez accorded with trial testimony, defense counsel's line of questioning was a reasonable strategic choice.  While defense counsel could have asked the detective about other items in the DD-5 form that appeared to differ from L.S. and Leni's trial testimony, defense counsel prioritized the "just about every day" discrepancy over other possibilities.

[9]    Defense counsel's decision not to submit L.S.'s Facebook photos as evidence, which apparently depict her as a fun-loving teen, could reasonably be found not to constitute ineffective assistance, since the photos were of insignificant evidentiary value.  (SR 118-133.) The Section 440 court reasonably found it "speculative" that cross-examination regarding these Facebook photos would have undermined L.S.'s credibility.  *(Id.* at 332.)

[10]    The earnings statements, Rodriguez argues, would have shown that he stopped paying health insurance premiums for Leni and L.S. before May 2003, suggesting that his move from the apartment was planned before the last kissing incident.  The lease for a new apartment, apparently signed prior to the last kissing incident, would also indicate a planned move.  But in denying the Section 440 motion, the state court found the evidentiary value of the lease and paystubs to be "insignificant."  (SR at 328.)  As the state court reasoned, such a planned departure could just as well have emboldened Rodriguez to engage in a last act with L.S. knowing that he would lose access to her after he moved out.  *(Id.* at 327.)  Defense counsel's reasonable strategy was to instead concentrate on impeaching Leni by underscoring her love for Rodriguez that belied her claim of abuse, rather than emphasizing the plan to move out through the paystubs and lease.

[11]    Rodriguez's herpes infection was repeatedly brought up at trial, and there were implications that Leni had contracted it as well.  (T. at 128-29, 228, 233, 241-42, 254-56.)  While trial counsel did not introduce data regarding rates of transmission, the prosecution briefly mentioned a transmission rate of fifty percent.  *(Id.* at 254-56.)  It is unlikely that further data would have helped in Rodriguez's defense; indeed, the data Rodriguez submitted with his Section 440 motion showed a herpes infection rate of twenty percent when symptomatic, and ten percent when asymptomatic, lower rates than those the prosecution noted at trial.  Such data does not prove that transmission was inevitable or even more likely than not.  The state court could reasonably find that trial counsel's decision not to pursue this data was a reasonable strategy. The trial judge, in denying the Section 440 motion, made clear that the herpes data submitted post-trial did not meaningfully help Rodriguez's case.  (S.R. 329; Petition at 48.)

lack of success does not warrant judicial second-guessing.  *DiTommaso*, 817 F.2d at 215.

Rather, these were reasonable tactical decisions, as the state court reasonably concluded.

### 2.  Failure to Call an Expert

 Rodriguez further claims that defense counsel's decision not to call his own expert—Dr.

N.G. Berrill, who had been engaged by the prior defense counsel in the case—constituted

ineffective assistance.

The Second Circuit has noted that "[t]here is no *per se* rule that requires trial attorneys to

seek out an expert."  *Gersten v. Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005) (quoting *Gersten v.*

*Senkowski*, 299 F. Supp. 2d 84, 100-01 (E.D.N.Y. 2004)); *see also Harrington v. Richter*, 562

U.S. 86, 111 (2011) ("*Strickland* does not enact Newton's third law for the presentation of

evidence, requiring for every prosecution expert an equal and opposite expert from the

defense.").  And a decision about "whether to call specific witnesses—even ones that might offer

exculpatory evidence—is ordinarily not viewed as a lapse in professional representation."  *Pierre*

*v. Ercole*, 560 F. App'x 81, 82 (2d Cir. 2014) (quoting *United States v. Best*, 219 F.3d 192, 201

(2d Cir. 2000)).

However, the Second Circuit has "underscored the importance of effective representation

for defendants in child sexual abuse prosecutions."  *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir.

2003).  Often the only eyewitnesses in child sexual abuse cases are the complainant and the

accused, and credibility becomes paramount.  *Id.*  The Second Circuit has instructed that an

attorney representing a defendant on charges of child sexual abuse "is obliged, wherever

possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's

credibility, and attack vigorously the reliability of any physical evidence of sexual contact

between the defendant and the complainant."  *Id.*  It is "difficult to imagine a child abuse case

. . . where the defense would not be aided by the assistance of an expert." *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001).

But the Court's analysis at this stage—requiring deference to a state court's denial of a claim of ineffective assistance—turns not on whether it was wise or unwise for counsel not to call an expert, nor even on whether this Court agrees with the state court's determination on the Section 440 petition; it instead hinges on whether the state court decision was *unreasonable*. *See Knowles*, 556 U.S. at 123. And here several factors lead the Court to find reasonable the state court's determination that defense counsel's examination of the prosecution expert and decision not to call a defense expert here were not ineffective. Here, unlike in *Gersten* and *Eze*, there was a third-party witness to the alleged conduct: Leni testified to seeing Rodriguez kiss her daughter with an open mouth. This sort of corroboration reduces the reliance on the credibility of the victim and defendant and the import of expert testimony, reducing the chance of prejudice here. In addition, unlike in *Gersten*, defense counsel extensively and effectively cross-examined the prosecution expert, eliciting helpful admissions of the sort that a defense expert would have brought up. Defense counsel's effective cross-examination of Dr. Treacy indicates that he educated himself regarding the relevant issues. *See Richter*, 562 U.S. 86 at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation . . . ."). The need for, and effect of, such a defense expert are further reduced where, as here, there was a bench trial before an experienced judge. The Section 440 court's decision on the expert issue was thus not unreasonable.

### 3. Opening the Door to Questions Regarding Rodriguez's Prior Conviction

Rodriguez further claims ineffective assistance on the basis that defense counsel opened the door to the prosecution's questions regarding Rodriguez's 1998 misdemeanor sexual misconduct conviction. Defense counsel refrained from questioning Rodriguez about the facts

underlying his 1998 conviction, which had been excluded by the trial judge.  (T. at 15-16.)

However, although it is not transcribed in the record, the trial judge, after sidebar, permitted the

prosecutor, over defense counsel's objection, to inquire about the details of the prior conviction

after Rodriguez on direct examination stated that he could not secure employment because this

charge appeared on a background check.  (Petition at 51-52; SR at 185-86; T. at 243-44.)  The

prosecutor proceeded, on cross, to question Rodriguez in general terms about the sexual

misconduct conviction; Rodriguez promptly volunteered unsolicited facts regarding the

conviction and denied having committed the 2008 crime, despite having pleaded guilty.  (T. at

286-91.)  Defense counsel objected to the continued line of questioning.  (*Id.* at 290.)

　　　　While an attorney's election to cause the introduction of evidence "is the kind of tactical

decision that courts in the Second Circuit are reluctant to second-guess," *Jeremiah v. Artuz*, 181

F. Supp. 2d 194, 205 (E.D.N.Y.2002), a defense attorney's decision to open the door to evidence

of the defendant's criminal history can be found objectively unreasonable under *Strickland*, *see,*

*e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490, 505 (2d Cir. 2009).

　　　　While this opening of the door here to cross-examination on the prior conviction may

have been unwise, it was Rodriguez himself, not defense counsel, who opened the door by

divulging unrequested facts.  In any event, the state court could reasonably find that *Strickland*'s

prejudice prong had not been satisfied.  The fact finder here was the trial judge, and we presume

his ability to properly discount the value of the prior conviction.  *See United States v. Duran-*

*Colon*, 252 F. App'x 420, 422-23 (2d Cir. 2007).  The state court could reasonably find that there

was not a reasonable probability that, but for the opening of the door to introduction of this prior conviction, the judge would have reached a different verdict.

### 4. Preparing Rodriguez for his testimony

Rodriguez also claims that he was denied effective assistance of counsel because his attorney failed to prepare him for cross-examination at trial.  (Petition at 32-33.)

There is no set rule for the number of times counsel must meet with a defendant.  *See, e.g.*, *United States ex rel. Testamark v. Vincent*, 496 F.2d 641, 642–43 (2d Cir. 1974) (rejecting failure-to-consult claim where attorney conducted an initial interview, "another interview occurred on the eve of trial," and petitioner "was before the court with counsel on various calendar calls"); *United States ex rel. Bradley v. McMann*, 423 F.2d 656, 657 (2d Cir. 1970) (rejecting ineffective counsel claim even though attorney "did not interview or consult with [defendant] until the day trial was to begin"); *Byas v. Keane*, No. 97 Civ. 2789, 1999 WL 608787 at *5 (S.D.N.Y. Aug. 12, 1999) (finding that petitioner meeting with counsel twice for five or ten minutes was sufficient since "[t]o require that counsel meet with petitioner a specific number of times would effectively establish a mechanical rule in defiance of *Strickland* "). Rodriguez's claim cannot, therefore, rest on a bare allegation that his counsel did not consult with him for enough time.

Moreover, affidavits submitted in support of Rodriguez's Section 440 motion indicate more than minimal communication between counsel and defendant.  Defense counsel met with Rodriguez a number of times, and in fact did a "quick dry run of direct examination" with Rodriguez prior to trial.  (SR at 58.)  An additional meeting was arranged to prepare Rodriguez for cross-examination, but Rodriguez showed up an hour late, so defense counsel instead devoted that meeting to planning the examination of Detective Hernandez.  (*Id.* at 59.)  These affidavits and the well-organized direct examination of Rodriguez suggest meaningful preparation.

Rodriguez's occasionally combative tone on cross-examination does not establish that defense counsel's performance in preparing him to testify fell below an objective standard of reasonableness.

Rodriguez contends that a lack of preparation also led him to mishandle on cross-examination his description of the prior conviction for sexual misconduct. But as discussed above, the state court could reasonably find that no prejudice resulted from the description of the prior sexual misconduct conviction.

Even when the various instances are considered together, the Court cannot find unreasonable the trial court's determination that defense counsel was not ineffective under *Strickland*, based on all of defense counsel's actions viewed collectively. Actions or omissions by counsel that "might be considered sound trial strategy" cannot constitute ineffective assistance, and the Section 440 court could reasonably find that counsel's actions here "might be considered sound trial strategy." *Poole*, 409 F.3d at 63.

On a record showing vigorous cross-examination and third-party corroboration before a judge as fact finder, the trial court could reasonably find no prejudice, that is, no reasonable probability that, but for the alleged error of opening the door to discussion of the prior conviction, the outcome of the proceeding would have been different. Further, the trial court could reasonably find no ineffective assistance on the basis of a lack of preparation of Rodriguez for testimony, since indications are that Rodriguez was in fact, prepared. Therefore the state court's finding that there had been no ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.

For these reasons, Rodriguez's claim of ineffective assistance of counsel fails.

### B.    Actual Innocence

Rodriguez also makes a freestanding actual innocence claim.

Actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup v. Delo*, 513 U.S. 298, 314 (1995) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  Still, the Supreme Court more recently has stated that it has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).  The Supreme Court has noted that tenable gateway claims of actual innocence are "rare," and require petitioner to "persuade the district court that, in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 1928 (citing *Schlup*, 513 U.S. at 329) (internal quotation marks omitted).

Even assuming that a freestanding habeas claim of actual innocence is a viable path to relief, Rodriguez's claim nevertheless fails.  Indeed, in the Appellate Division, Rodriguez failed to meet the lower threshold of proving that the verdict was against the weight of the evidence. *Rodriguez*, 115 A.D.3d at 581, *leave to appeal denied*, 23 N.Y.3d 967 (2014).  Given the credible testimony from the victim describing multiple instances of sexual abuse, the corroboration from the mother witnessing the final act of sexual conduct toward the victim, Rodriguez's evasiveness on the stand, and the lack of new evidence not available to the Section 440 and Appellate Division judges, Rodriguez has not shown that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 133 S. Ct. at 1928.

Accordingly, Rodriguez's claim of actual innocence fails.

**IV.    Conclusion**

For the foregoing reasons, the Petition is DENIED.

Because Petitioner Nilton Rodriguez has failed to make a substantial showing that he was denied a constitutional right, a certificate of appealability shall not issue.  28 U.S.C. § 2253(c). The Clerk of Court is directed to close this case.


SO ORDERED.


Dated: January 24, 2017
       New York, New York

_____
            J. PAUL OETKEN
         United States District Judge


*COPY MAILED TO PRO SE PARTY*